**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff,* | : | Case No. 1:21-cr-17 |
| | : | |
| vs. | : | Judge Jeffery P. Hopkins |
| | : | |
| JORDAN WIMBERLY, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

## OPINION & ORDER

Pending before the Court is Defendant Jordan Wimberly's motion for acquittal (Doc. 115), the Government's response in opposition (Doc. 131), and the Defendant's reply (Doc. 132). For the reasons set forth herein, the Defendant's motion is **DENIED**.

## I.    BACKGROUND

Defendant Jordan Wimberly and former co-defendant, Ryan Carter, were charged in a one-count indictment on March 11, 2021, with the use of a firearm to commit murder during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and 924(j)(1), and *Pinkerton v. United States*, 328 U.S. 640 (1946). *See* Doc. 4. The factual allegations underlying the indictment essentially boil down to this: Defendant Wimberly and Mr. Carter allegedly arranged to meet Lerois Harris on the evening of January 29, 2015, under the guise of purchasing marijuana. But rather than purchasing marijuana from him that evening, Defendant Wimberly and Mr. Carter proceeded to rob Mr. Harris of the marijuana, and during the robbery, they shot Mr. Harris multiple times. Mr. Harris ultimately succumbed to

the injuries he sustained during the shooting, but not before telling the police officers responding to the scene that an individual named "Rico" had shot him.

Defendant Wimberly and Mr. Carter proceeded to trial by jury on September 25, 2023. At the close of the Government's evidence, counsel for Defendant Wimberly and counsel for Mr. Carter both orally moved for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. Both motions were denied on the record. Ultimately, after a nine-day trial, inclusive of multi-day deliberations, the jury acquitted Mr. Carter.

The jury, however, was unable to reach a unanimous verdict as to Defendant Wimberly, and this Court therefore declared a mistrial as to him and discharged the jury on October 5, 2023. The jury reported, upon request of the Court and outside the presence of counsel, that the jury was split seven to five in favor of conviction. Defendant Wimberly now seeks acquittal on the basis that there is insufficient evidence to sustain a conviction.

## II.     LAW & ANALYSIS

When a jury fails to return a verdict, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days [] after the court discharges the jury." Fed. R. Civ. P. 29(c)(1). As here, where the defendant challenges the sufficiency of the evidence to sustain a conviction, "the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In answering this question, the trial court must view the record in the light most favorable to the prosecution, *United States v. Abner*, 35 F.3d 251, 253 (6th Cir. 1994), and draw all inferences in the government's favor, *United States v. Torres-Ramos*, 536 F.3d 542, 556 (6th Cir. 2008). Importantly, the trial court must not "weigh conflicting evidence nor consider the credibility

2

of witnesses." *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984). To do otherwise, would "invade the province of the jury as the sole finder of fact." *Id.* And as the Sixth Circuit has consistently held, there is "a 'very heavy burden' [on] a defendant making a sufficiency of the evidence challenge." *United States v. Johnson*, 443 F. App'x. 85, 91 (6th Cir. 2011) (quoting *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002)).

To establish his insufficiency of evidence claim, Defendant Wimberly must show that the Government failed to prove beyond a reasonable doubt that he or a co-conspirator[1] committed the elements of the crime for which he was charged—that is, use of a firearm to commit murder during and in relation to a crime of violence. Here, he focuses his attention on the crime of violence, interference with commerce by robbery, also known as "Hobbs Act robbery," in violation of 18 U.S.C. § 1951(a). Hobbs Act robbery requires the Government to prove that Defendant Wimberly or a co-conspirator did knowingly and unlawfully take personal property from someone, or in the presence of another, against that person's will, by actual or threatened force, or violence, or fear of injury to the person, and that as a result, interstate commerce was affected in any way or degree. 18 U.S.C. § 1951.

Defendant Wimberly trains his attack against the prosecution's evidence on whether the Government offered proof beyond a reasonable doubt that he or a co-conspirator did in fact take marijuana from Mr. Harris. Defendant Wimberly alleges that there is no evidence that supports a finding that a robbery actually took place. Doc. 115, PageID 639. The Government maintains, however, that circumstantial evidence shows that Defendant Wimberly or a co-conspirator succeeded in robbing Mr. Harris because law enforcement did

---

[1] As the jury was instructed at trial, there were two ways for the Government to prove Defendant Wimberly guilty of the crime charged beyond a reasonable doubt. The first was by convincing the jury that Defendant Wimberly personally committed or participated in the crime. And the second was based on the theory that he conspired with one or more other persons to commit the crime charged.

not recover marijuana from his person or from the premises on which the shooting occurred. Doc. 131, PageID 1179–80.

It is well established that "circumstantial evidence alone can sustain a guilty verdict," which means that "[such] evidence need *not* remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). Additionally, "physical evidence is not required to sustain a conviction." *United States v. Henderson*, 626 F.3d 326, 341 (6th Cir. 2010). Given the inferences that could be drawn from the circumstantial evidence in this case, a rational trier of fact could have found that a robbery did in fact occur.

Much of the circumstantial evidence the Government presented in this case arose from the testimony of three Government witnesses: Jerome Smith, Dayshia Wright, and Kendra McCombs. Mr. Smith and Ms. Wright held close personal relationships with Defendant Wimberly. Mr. Smith testified that he had been hanging out with Defendant Wimberly on a daily basis around the time the incident occurred, while Ms. Wright testified that she had been dating Defendant Wimberly at the time. Mr. Smith and Ms. Wright both claimed to have knowledge of the robbery and homicide based on conversations they either had with Defendant Wimberly or overheard Defendant Wimberly participate in shortly after the incident occurred. Ms. McCombs had been in a long-term relationship with Mr. Harris and at trial, she gave an eyewitness account to the events that unfolded on January 29, 2015.

Mr. Smith testified, in relevant part, that:

- He met Defendant Wimberly and Christopher Jones through a mutual friend, Ismail Salaam, in December 2014. Smith Transcript, Doc. 103, 3:20–25, 9:10–16, 10:2–6. After he met Defendant Wimberly, they "struck

4

up like a brotherhood" and "would be together on a day-to-day basis." *Id.* at 11:20–12:3.

- Mr. Smith learned of a person named "Duke" (later identified as Mr. Harris, the victim of the homicide in the case)[2] because Defendant Wimberly, Mr. Salaam, and Mr. Jones were "purchasing their marijuana from [Mr. Harris] at the time." *Id.* at 12:11–19.

- Mr. Smith claimed to have been present for "roughly three" purchases of marijuana from Mr. Harris. *Id.* at 16:5–7.

- The first time that he went with Defendant Wimberly, Mr. Salaam, and Mr. Jones to buy weed from Mr. Harris, they met him on Linn Street near Clark Street.[3] *Id.* at 13:16–14:12. He recalled the meeting spot being near "a Lincoln Center," which was "like a recreational center."[4] *Id.* at 15:12–16.

- Prior to meeting up with Mr. Harris the first time, "they had made a comment saying – or a statement saying they wanted to rob [Mr. Harris] because he kept a lot of money on him." *Id.* at 14:21–15:3.

- The second and third marijuana purchases occurred in the same area near Linn Street and Clark Street. *Id.* at 16:14–15, 17:6–10.

- They [Defendant Wimberly, Mr. Salaam, Mr. Jones, and Mr. Smith] were collectively buying "[a]nywhere from like a quarter ounce to a half ounce" of weed from Mr. Harris, and that such quantities could fit into somebody's pocket. *Id.* at 17:14–18:5.

---

[2] Kendra McCombs testified that Lerois Harris went by "Duke." McCombs Transcript, Doc. 126, 3:10–11.
[3] The shooting of Mr. Harris occurred at 1096 Linn Street. *See* Gov. Ex. 3.
[4] The Lincoln Recreation Center is located on Linn Street, near the corner of Clark Street. *See* Gov. Ex. 5.

- A short time after these three purchases, and while he was out of town, Defendant Wimberly called Mr. Smith and "stated that a situation happened last night where they went to rob somebody and [*sic*] – which was [Mr. Harris]. And when they went to rob him, he told him that [Mr. Harris] tried to grab the gun and that he had shot him." *Id.* at 27:5–19.

- Defendant Wimberly also told Mr. Smith that "prior to that they called [Mr. Harris] for some marijuana." *Id.* at 28:1–4. "They" included Defendant Wimberly, Mr. Jones, Mr. Carter,[5] and "Blue." *Id.* at 28:5–10.

- Defendant Wimberly further explained to Mr. Smith that "there was some kid and there was some female" at the home on the evening of the robbery, and that the female was screaming. *Id.* at 28:11–20.

Similarly, Ms. Wright, testified, in relevant part, that:

- She dated Defendant Wimberly for approximately eight or nine months, before the relationship ended in March 2015 (approximately two months after the January 29, 2015, shooting). Wright Transcript, Doc. 102, 4:19–5:2.

- While they were dating, she overheard a conversation that Defendant Wimberly had with Mr. Carter, and during that conversation Defendant Wimberly and Mr. Carter sounded "agitated, argumentative." *Id.* at 14:23–25.

- Ms. Wright also heard Defendant Wimberly say "that the guy was trying to wrestle him, and that if he wouldn't have wrestled him, he wouldn't have – that's how he got shot." *Id.* at 15:1–6. "Duke", *i.e.*, Mr. Harris, was the person who was shot. *Id.*

---

[5] The parties stipulated that "Ryan Carter made a phone call on which he identified himself as Ryan 'Nuke' Carter." Doc. 92, PageID 318.

at 19:24–20:1. Defendant Wimberly also said "he wouldn't have got shot had [Mr. Harris] just gave it up and not tried to fight him. He had to shoot him because he was big out on him." *Id.* at 21:10–15.

- Ms. Wright also heard Defendant Wimberly say that there was "a female" in the home "cooking" at the time of the shooting. *Id.* at 22:9–15.

- Lastly, Ms. Wright heard Defendant Wimberly say that Mr. Carter "knew the guy [Mr. Harris], and that he supposedly knew what was in the house," but "it was not in the house." *Id.* at 20:4–8. And that, "supposedly he was the one who told [Defendant Wimberly] that it was weed and money in there." *Id.* at 19:3–6.

Ms. McCombs, the victim's girlfriend and an eyewitness to the shooting, testified, in relevant part, that:

- Mr. Harris worked at Children's Hospital for more than ten years but he had lost his job a few months before his death. McCombs Transcript, Doc. 126, 41:3–18.

- Ms. McCombs was not aware that Mr. Harris sold marijuana, but he had smoked marijuana in her presence. *Id.* at 41:19–22.

- She had a rule that Mr. Harris could not smoke in her home if her son was there. *Id.* at 41:23–42:3. Mr. Harris had to "step outside" if he wanted to smoke. *Id.*

- Her son was home on January 29, 2015. *Id.* at 42:8–9.

- On January 29, 2015, Ms. McCombs was cooking dinner when Mr. Harris received a phone call. *Id.* at 10:25–11:13. Mr. Harris went into the bathroom, so she could not hear the full conversation. *Id.*

- After the phone call, Mr. Harris stepped outside, through the backdoor, indicating that "he was hot." *Id.* at 11:14–18.

7

- She later heard "a tussle" against the front door, and then heard a gunshot as the door opened. *Id.* at 11:24–12:11.

- She saw Mr. Harris fall back into the house. She then saw a male "standing over him telling him 'nah, nah, nigger, lay down.'" *Id.* at 12:12–15, 18:12–13.

- She also saw a second male near the doorway, but still outside. *Id.* at 18:20–19:1.

- She came out of the kitchen and said, "please don't shoot." *Id.* at 19:11–13, 19:20–24. The male in the house turned the gun toward her and said, "Shut the fuck up, bitch, before I shoot you too." *Id.* at 19:14–15.

- The second male then said, "there's babies in the house," at which time Ms. McCombs turned and realized her son was standing there. *Id.* at 19:16–19, 20:17–22. She ran to get him and took him to her bedroom. *Id.* 20:23–21:1.

- While she was running, she heard three more shots but she did not see who fired those shots. *Id.* at 20:25–21:7.

- She planned to leave out the bedroom window but saw two shadowy figures running "up the back, up the street." *Id.* at 21:12–17. She did not hear anything else, so she thought the two males had left. *Id.* at 21:18–22.

- She left the bedroom, found Mr. Harris sitting on the front step, and then called 911. *Id.* at 21:23–22:9.

Here, consistent with prosecution witnesses' testimony, the record establishes that a rational trier of fact could have concluded that Defendant Wimberly made statements that not only place him at the scene of the shooting, but more importantly, corroborate other evidence that proves he had planned to rob Mr. Harris. Mr. Smith testified that he had been hanging out with Defendant Wimberly on a daily basis just before the shooting, had been

8

with Defendant Wimberly on three occasions when he purchased marijuana from the victim, and the location of the purchases he described matched the area where the robbery was alleged to have occurred. Mr. Smith also testified that Defendant Wimberly had been planning to rob Mr. Harris before the incident, and then that Defendant Wimberly called *after* the incident to report that he shot Mr. Harris during a robbery. Mr. Smith and Ms. Wright also both testified that they heard Defendant Wimberly say that other people, including a female and child, were home at the time of the shooting—aligning with Ms. McCombs' eyewitness testimony.

Defendant Wimberly argues that Ms. Wright's testimony establishes that a robbery did not occur because the property believed to be "in the house," "was not in the house." *See* Doc. 102, 20:6–8. However, a rational trier of fact could find based on other testimony, such as that of Mr. Smith and Ms. McCombs, that Defendant Wimberly fled before having an opportunity to look for property in the house. *See* Smith Transcript, Doc. 103, 27:20–23 ("And then he said after he shot him the first time, he grabbed his pants leg, and that he had shot him a couple more times to get him off his pants leg. And then him and the guys he went to do it with, they fled."). Lastly, considering the small pocket-sized quantity of marijuana that Defendant Wimberly purchased from Mr. Harris on several prior occasions, a rational trier of fact could have found that such a quantity of marijuana was pilfered from Mr. Harris' person or that it had been handed over beforehand in anticipation of payment in the moments surrounding the robbery and shooting. *Id.* at 17:14–18:5.

Accordingly, based on the testimony of Mr. Smith, Ms. Wright, and Ms. McCombs, a rational tier of fact could have found that Defendant Wimberly or a co-conspirator physically threatened or used violence against Mr. Harris during the course of the robbery,

that Mr. Harris attempted to defend himself, and that a robbery nonetheless occurred. *See* Smith Transcript, Doc. 103, 27:10–23; Wright Transcript, Doc. 102, 21:10–15.

A rational trier of fact could likewise have determined that the prosecution witnesses' testimony was corroborated, at least in part, by the cellular phone data presented at trial. To set the stage for the cellular data that was later introduced, Ms. Wright testified that Defendant Wimberly's phone number was (513) 205-8549 (the "8549 phone"). Wright Transcript, Doc. 102, 8:12–14. Mr. Smith also testified that Defendant Wimberly had called him from the 8549 phone,[6] and Mr. Smith had called Defendant Wimberly at that number. Smith Transcript, Doc. 103, 30:22–31:3.

As an opinion witness, Special Agent Derek Graham of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified about historical cell site location data and call detail records related to the 8549 phone and a phone number associated with Mr. Harris, (513) 253-5003 (the "Harris phone").[7] Specifically, Special Agent Graham testified that on January 29, 2015, there was an outgoing call from the 8549 phone to the Harris phone at approximately 7:25 p.m. Graham Opinion Transcript, Doc. 125, 35:8–20. Under the circumstances, a rational trier of fact could have inferred that this was the same phone call that Ms. McCombs observed Mr. Harris receive just prior to him exiting her apartment on the night of the shooting. Special Agent Graham also testified that, at the time of the call, the 8549 phone and the Harris phone were interacting with the same cell tower, which could have led a rational trier of fact to conclude that the 8549 phone and the Harris phone were in close

---

[6] During his testimony, Mr. Smith initially stated that the number was (513) 405-8549. However, he later referred to the number as (513) 205-8549, and none of the parties challenged him on the initial misstatement. Smith Transcript, Doc. 103, 39:10–14.

[7] The parties stipulated that: "One of the iPhones recovered from Lerois Harris on January 29, 2015, was assigned phone number 513-253-5003." Doc. 92, PageID 318.

proximity at the time the call was made. *Id.* at 51:11–12. Special Agent Graham further stated that the Cincinnati Police Department CAD report indicated that the 911 call made from 1096 Linn Street was placed at approximately 7:30 p.m., only minutes after the previous call. *Id.* at 52:20–24; *see also* Gov. Ex. 3.

Without weighing conflicting evidence or considering the credibility of the witnesses, *see Adamo*, 742 F.2d at 935, the Court finds that the circumstantial evidence would have allowed a rational trier of fact to find all essential elements of the crime charged beyond a reasonable doubt. When considering all of the testimony and evidence presented at trial, a rational trier of fact could have reasonably concluded or inferred: (1) that consistent with his prior behavior, Defendant Wimberly placed a call to Mr. Harris at approximately 7:25 p.m. on January 29, 2015, to arrange to "buy" marijuana from him, (2) that because Ms. McCombs' son was home, Mr. Harris went outside to meet Defendant Wimberly with the intention of selling him marijuana as he had done in the past, (3) that Defendant Wimberly or a co-conspirator threatened or used actual force against Mr. Harris in front of Ms. McCombs and her son inside her apartment, and (4) that Defendant Wimberly or a co-conspirator ultimately shot Mr. Harris multiple times and robbed him of the marijuana, given the absence of the marijuana at the scene.

Based on this analysis, the Court easily disposes of Defendant Wimberly's second argument: that the Government failed to prove that the crime charged affected interstate commerce. To prove that interstate commerce was affected in any way or degree, the Government need only prove that Defendant Wimberly or a co-conspirator "robbed [] a drug dealer of drugs or drug proceeds." *Taylor v. United States*, 579 U.S. 301, 303 (6th Cir. 2016) (holding that the government can satisfy the commerce element necessary for Hobbs Act

robbery by showing that a defendant "robbed or attempted to rob a drug dealer of drugs or drug proceeds").[8] There is evidence that shows Mr. Harris sold marijuana to Defendant Wimberly in the past implicating him as a drug dealer. Smith Transcript., Doc. 103, 12:13–17:15. Because a rational trier of fact could have found that Defendant Wimberly met up with Mr. Harris, a drug dealer, and stole marijuana at gun point from him, a rational trier of fact could also have found that such act affected interstate commerce, thereby satisfying that element of the crime.

Defendant Wimberly's third and final argument also comes up short. Defendant Wimberly contends that Ms. McCombs' trial testimony and inability to positively identify Defendant Wimberly, demonstrates the insufficiency of the Government's evidence to prove Defendant Wimberly's actual involvement in the crime as charged. The Court agrees with the Government, however, that a rational trier of fact could have found otherwise.

A rational trier of fact could have found that Ms. McCombs' description of the male involved in the shooting resembled Defendant Wimberly. *Compare* McCombs Transcript, Doc. 126, 22:15–23:15 *and* Wimberly Ex. 1, *with* Gov. Ex. 11a, 14b. A rational trier of fact could also have been persuaded by the testimony of Mr. Smith and Ms. Wright, both of whom testified about Defendant Wimberly's admitting to involvement in the shooting of Mr. Harris. *See supra*. Or a rational trier of fact could have been influenced by the cellular data, which showed that a phone associated with Defendant Wimberly called a phone associated with

---

[8] *Taylor v. United States*, 579 U.S. 301 (2016) is not to be confused with *United States v. Taylor*, 142 S. Ct. 2015 (2022), which has separate implications in this case. *United States v. Taylor* stands for the proposition that "attempted Hobbs Act robbery does not qualify as a 'crime of violence' under 18 U.S.C. § 924(c)(3)(A) because no element of the offense requires proof that the defendant used, attempted to use, or threatened to use force." *United States v. Taylor*, 142 S. Ct. 2015, 2016 (2022). This means that, here, it is not enough for the Government to prove *attempted* Hobbs Act robbery; rather, the Government must prove *completed* Hobbs Act robbery.

Mr. Harris only minutes before the shooting and while the two phones were in close proximity to one another.

In sum, Mr. Harris' dying declaration made at the scene of the shooting to first responders, Lt. Andrew Heyob and Officer Mark McChristian, coupled with other investigative facts gathered by the prosecution and presented to the jury could likewise have led a rational juror to the same conclusion. At the scene, Lt. Heyob and Officer McChristian told Mr. Harris that "he was more than likely not going to survive," and "at that point, [Mr. Harris] made a statement that 'Rico did it. Rico shot me.'" Heyob Transcript, Doc. 120, 6:20–24. Shortly after identifying "Rico" as the shooter, Mr. Harris passed out, and to Lt. Heyob's knowledge, Mr. Harris never regained consciousness. *Id.* at 6:25–7:1.

A rational trier of fact could have surmised that Mr. Harris was referring to Defendant Wimberly in his dying declaration because Ms. Wright later testified during trial that one of Defendant Wimberly's nicknames was "Rico," *see* Wright Transcript, Doc. 102, 7:13–14, and that Defendant Wimberly had told her "that's what they called him downtown," *id.* at 7:15–17. She even testified that she paid his phone bill once, and the phone bill was under the name "Rico Smith." *Id.* at 8:21–9:9.

It is the jury's job "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. A rational juror could have determined that Mr. Harris was robbed of marijuana, that the robbery affected interstate commerce, and that Defendant Wimberly was involved.

## III.    CONCLUSION

A defendant claiming insufficiency of evidence bears a very heavy burden. *Hughes*, 505 F.3d at 592. Defendant Wimberly has not carried that burden here. Accordingly, for the

foregoing reasons, Defendant Wimberly's motion for acquittal (Doc. 115) is **DENIED**. This matter shall proceed to a second jury trial, as scheduled, on April 1, 2024.

      **IT IS SO ORDERED.**

February 6, 2024

                              Jeffery P. Hopkins
                              United States District Judge